Ginger F. MADDOX, James L. Maddox and Sandra M. Domengaux

v.

UNITED STATES of America.

Civ. A. No. 90–0388.

United States District Court,
W.D. Louisiana,
Shreveport Division.

July 11, 1991.

John Hammons, Nelson, Hammons & White, Shreveport, La., for plaintiffs.

U.S. Atty. Joseph S. Cage, Asst. U.S. Atty. John Halliburton, Dept. of Justice, Shreveport, La., for defendant.

## MEMORANDUM OPINION

STAGG, District Judge.

This is an action for compensatory damages allegedly caused by the medical malpractice of the medical staff of the Veterans Administration Hospital (hereinafter "the VA") in Shreveport, Louisiana. VA personnel discharged Elmer L. Maddox from the VA emergency room and Mr. Maddox suffered a stroke several hours later that ultimately took his life. The plaintiffs, Ginger F. Maddox, wife of decedent Elmer L. Maddox, and James L. Maddox and Sandra M. Domengaux, the two children of decedent, filed suit under the Federal Tort Claims Act (hereinafter "FTCA"), 28 U.S.C. §§ 2671, *et seq.* The case was tried to the bench on May 13 and 14, 1991. In accordance with the following findings of fact and conclusions of law, the court finds that plaintiffs have failed to prove that the Veterans Administration medical personnel were negligent and that such negligence caused the decedent's injuries.

■ Under the FTCA, the United States is liable in the same manner and to the same extent as a private individual under like circumstances. 28 U.S.C. § 2674. Accordingly, the appropriate law to follow in determining liability under the FTCA is the law of Louisiana. *Sewell v. United States,* 629 F.Supp. 448, 451 (W.D.La.1986). La. Rev.Stat. 9:2794 provides that in an action based on the alleged malpractice of a physician, plaintiff has the burden of proving: (1) the degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians licensed to practice in the State of Louisiana and actively practicing in a similar community or locale under similar circumstances; (2) that the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill; and (3) that, as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care, the plaintiff suffered injuries that would not otherwise have been incurred. In the event the physician is deemed negligent, his employer is vicariously liable for his breach of this professional duty. La.Civ.Code Art. 2320.

■ Louisiana courts apply a duty-risk analysis in assessing liability under these provisions. Under the duty-risk analysis, the plaintiff must demonstrate: (1) that the hospital's actions were a cause-in-fact of injury; (2) that the hospital owed the plaintiff a duty which was imposed to protect against the risk involved; (3) that the hospital breached that duty; and (4) that plaintiff suffered an injury. *C.F. Biggs v. United States,* 655 F.Supp. 1093, 1094 (W.D.La. 1987). In a malpractice action in which the patient has died from the alleged negligent failure to diagnose his illness, he need show "only that there would have been a chance of survival, 'and that the patient was denied this chance of survival because of the defendant's negligence.'" *Dimitry v. United States,* 893 F.2d 666 (5th Cir. 1989), *quoting Smith v. State through De-*

*partment of Health and Human Resources Administration*, 523 So.2d 815, 819 (La.1988).

Elmer L. Maddox and his wife, Ginger F. Maddox, arrived at the VA in Shreveport, Louisiana, at 12:20 A.M. on November 23, 1987, and presented to the hospital staff a description of symptoms which are the focus of this litigation. The symptoms presented to the VA personnel are disputed and are determined by the court based upon the testimony of the treating physician, Dr. Craig Broussard, Dr. Broussard's notes on the hospital records, the notes of an unidentified nurse who obtained an oral history from Mr. Maddox, and the testimony of Mrs. Maddox regarding what information was conveyed to the medical staff. This testimony, which requires that this court make difficult credibility determinations, revealed that the primary complaint of Mr. Maddox was neck pain. This pain was obviously severe; the Maddoxes drove from their rural home to the emergency room, arriving after midnight. Plaintiffs contend that the medical personnel failed to appreciate the head pain suffered by Mr. Maddox at the time of his presentment to the emergency room. Plaintiffs argue that the court should rely upon Mrs. Maddox' testimony that her husband complained of head pain, and Dr. Broussard's concerns that Mr. Maddox may have suffered from a sub-anarachnoid hemorrhage. Each physician testified that in a large majority of cases, excruciating head pain is the most prevalent symptom of a sub-anarachnoid hemorrhage; accordingly, plaintiffs contend that Dr. Broussard must have been aware of patient's complaints of severe head pain. Dr. Broussard, however, stated without hesitation that he specifically asked Mr. Maddox if he was suffering from head pain and was told that he was not. The court was convinced that Dr. Broussard recounted this statement as he remembers it, and that, at the time of Mr. Maddox' examination, head pain was not the major complaint.

■ Plaintiffs also contend that Mr. Maddox' severe head pain was communicated to the nurse who initially took the pa-tient's history, but that this nurse failed to record such information on his medical record. That medical record reveals that Mr. Maddox complained of "severe posterior neck pain radiating down both sides of neck into shoulders." Joint Exhibit 1, p. 301. Unfortunately, the nurse who obtained this history was not produced at trial by either party. Plaintiffs argue that the United States' failure to call this witness creates a presumption that the testimony of the unidentified nurse would be unfavorable to the defense. The United States Court of Appeal for the Fifth Circuit recently examined the "uncalled witness rule," and found that it "has no place in federal trials conducted under the Federal Rules of Evidence and the Federal Rules of Civil Procedure." *Herbert v. Wal–Mart Stores, Inc.*, 911 F.2d 1044, 1047 (5th Cir. 1990). The failure of the defense to call this nurse, however, creates a permissible inference that her testimony would be harmful. Despite this inference, this court concludes that the medical record correctly states the complaints made by Mr. Maddox at the time of his presentment to the emergency room. Although Mrs. Maddox testified to the contrary, her testimony does not convince the court that Mr. Maddox' symptoms were clearly articulated to the emergency room personnel. His primary complaints were accurately reflected on the emergency room records. As will be discussed below, however, the court also remains unconvinced that Dr. Broussard would have acted differently had he been made aware of head pain suffered by Mr. Maddox; the court also remains unconvinced that Dr. Broussard's failure to take further action had he known of Mr. Maddox' head pain would have constituted medical malpractice. Were this court to find that the nurse taking Mr. Maddox' history failed accurately to record his symptoms, and were this court then to impute such information to Dr. Broussard, the court remains unconvinced that Dr. Broussard would have breached the applicable standard of care.

■ In attempting to establish that Dr. Broussard breached the applicable standard of care in this case, plaintiffs relied

upon Dr. George M. McCormick Jr., Caddo Parish Coroner and a forensic pathologist, and Dr. Mike Fleming, a practicing physician specializing in family practice. These physicians convinced the court of the basic methodology utilized to reach a diagnosis, but failed to convince the court that Dr. Broussard breached a standard of care applicable to any physician presented with Mr. Maddox' symptoms.

The evidence established that a physician confronted with Mr. Maddox' emergency room presentation must take an accurate history of patient's complaints and arrive at a diagnosis after ruling out possible "differentials." This "differential diagnosis" was the focus of much of the plaintiffs' case. The physicians offered by plaintiff and the physicians offered by the defendant testified regarding each of the complaints made by Mr. Maddox and testified regarding the diagnosis and treatment that could be offered in light of those complaints, and the adequacy of Dr. Broussard's methodology or differential diagnoses. These physicians failed to agree on the significance of Maddox' symptoms.

The plaintiffs contend that Dr. Broussard failed to reach a proper diagnosis in this case because of an improperly performed differential diagnosis. As the testimony of the physicians revealed, the performance of the differential diagnosis is a basic standard in the practice of medicine. When presented with a patient's symptoms, the physician must identify possible causes and then do whatever is necessary to eliminate possible diagnoses. All agreed that the physician must rule in or rule out serious diagnoses that were included in the differential diagnosis by whatever tests that were necessary. As Dr. Broussard testified, the differential diagnoses are entertained at the time of evaluation as a part of the thought process used in arriving at a diagnosis.

At 12:20 A.M. on November 23, 1987, Dr. Broussard went through the analysis just described, and arrived at a diagnosis. The information upon which this determination was based included the following. As described above, the primary pain was neck pain. Although Mr. Maddox may have suffered from head pain, at the time of his presentment it was not his chief complaint and he failed to emphasize this complaint. The emergency room records and Dr. Broussard's testimony also revealed that Mr. Maddox stated that his neck pain had progressed over a two-week period and was now so severe that he could not sleep. The presence of pain for two weeks is particularly significant. Mr. Maddox also complained of numbness in his left hand for an hour before presentment to the emergency room. Mr. Maddox noted two episodes of pain on November 23—at 4:00 P.M. and 7:30 P.M.—and that this pain was slightly relieved by codeine. Dr. Broussard testified that Mr. Maddox denied that he had a headache, denied that he had chest discomfort, and denied that he had any weakness.

Dr. Broussard testified that he performed numerous tests on Mr. Maddox in arriving at a diagnosis. He listened to Mr. Maddox' heart, performed a "pin prick" test because of the presence of numbness in Mr. Maddox' hand, checked the patient's neurological status, checked Maddox' pupils for responsiveness, his cranial nerve function, strength, peripheral pulses, and checked extremities for sweating, edema and capillary refill. Mr. Maddox also complained of rectal bleeding and was given a rectal examination. Dr. Broussard also performed a range of motion examination, and ordered a "C Series" or neck x-ray. Dr. Broussard was also presented with additional objective information that was considered in his differential diagnosis and, ultimately, his diagnosis. Mr. Maddox was 65 years old and overweight, was a non-insulin dependent diabetic with a blood sugar reading of 281, pulse of 90 and respiration of 22. His blood pressure was 167/102 upon arrival, later 174/93 and before release was 174/83.

Only several of the tests performed by Dr. Broussard were reflected in hospital records, and all physicians agreed that his record-keeping was substandard. Nevertheless, the court was presented with testimony from Dr. Broussard regarding his examination, and concludes that his testimony was credible and that the additional

tests—although not recorded—were, in fact, performed.

Dr. Broussard's examination of Mr. Maddox' neck is of particular importance. The emergency room record and Dr. Broussard's testimony indicate that he found there was a "free range of movement without point tenderness."

When presented with these symptoms, Dr. Broussard made a differential diagnosis of trauma, sub-anarachnoid hemorrhage, meningitis and arthritis. Obviously, numerous other possibilities were eliminated because they did not involve symptoms exhibited by Mr. Maddox. Trauma was eliminated because Mr. Maddox was able to state that no trauma had occurred. Sub-anarachnoid hemorrhage was eliminated because of the absence of any meningeal signs, or stiffness of the neck. Meningitis was eliminated because of the same reason and because Mr. Maddox was not suffering from a high temperature. The presence of narrowing of the C5–C6 interspace as revealed on the spinal x-ray, the numbness in Mr. Maddox' hand, the negative neurological examination, the "pin prick" examination, Mr. Maddox' strength, gait and demeanor led Dr. Broussard to his ultimate diagnosis of neck spasm related to a narrowing in the C5 and C6 vertebrae.

The plaintiffs attack Dr. Broussard's failure to give more significance to several of Mr. Maddox' symptoms, including the elevated blood pressures, respiration and blood sugar, as well as the two episodes of increased pain. Plaintiffs contend that Dr. Broussard should have recognized a stroke in evolution or at least recognized that Mr. Maddox' condition was unstable and kept him for observation and further tests. Plaintiffs failed to prove, however, that Dr. Broussard breached the applicable standard of care. Although the testimony revealed that an elevated blood sugar level could be indicative of trauma, such as heart attack or stroke, an isolated blood sugar level of 281 in a non-insulin dependent diabetic like Mr. Maddox was not significantly elevated. For long-range health purposes, this blood sugar level should be lower, but did not alone, or in conjunction with other symptoms, require admittance. Plaintiffs also challenge Dr. Broussard's failure to ask Mr. Maddox the time of his meal when evaluating the blood sugar level. Because such information would have made no difference for purposes of his analysis, however, the failure to inquire further was not necessarily improper. Dr. Broussard was not trying to manage the blood sugar level, but merely trying to determine whether the patient could safely return home.

Although Mr. Maddox' blood pressures were elevated, plaintiffs failed to prove that this symptom—alone or in conjunction with the other symptoms presented to Dr. Broussard—required a different diagnosis. Dr. Broussard listened to Mr. Maddox' heart, and, although he did not perform an EKG, was convinced that the heart was functioning properly and that the blood pressure reading at the time of discharge—174/83—was not so high as to require further observation.

Plaintiffs contend that Dr. Broussard improperly eliminated sub-anarachnoid hemorrhage as part of the differential diagnosis. The testimony revealed, however, that a full range of motion in the neck was inconsistent with sub-anarachnoid hemorrhage, which would generally include meningeal symptoms. In addition, there would generally be head pain more intense than suffered by Mr. Maddox, even if this court were to accept plaintiffs' version of the symptoms presented to Dr. Broussard and the hospital staff. Although additional tests, such as a spinal tap, could have revealed more clearly the absence of a sub-anarachnoid hemorrhage, such a test was unnecessary; Dr. Broussard's examination eliminated sub-anarachnoid hemorrhage and conformed with the standard of care. Plaintiffs also failed to convince the court that Mr. Maddox had suffered a sub-anarachnoid hemorrhage or hemorrhagic stroke at the time of his presentment to the emergency room.

Plaintiffs did identify inconsistencies between Dr. Broussard's statement that he felt Mr. Maddox suffered from neck spasm and the examination which revealed a free range of motion and absence of pain on

palpation; however, Mr. Maddox' degenerative disc problem was consistent with the symptoms presented and the treatment offered. Plaintiffs challenge the differential diagnosis, yet the diagnosis that was missed—stroke—was not nor should it have been a part of Dr. Broussard's differential diagnosis.

Although it was ultimately revealed that Dr. Broussard's diagnosis was incorrect, plaintiffs failed to prove that Dr. Broussard breached the applicable standard of care when he authorized the release of Elmer M. Maddox with prescriptions for Valium, Motrin, a neck brace and an appointment for additional orthopedic therapy. Although some physicians may have exercised additional caution and kept the patient for observation, Dr. Broussard's diagnosis was consistent with the symptoms before him and he performed a proper diagnosis methodology. Dr. Broussard's failure to discover the presence of a stroke in progress or to recognize that Mr. Maddox was unstable, although unfortunate, was not unreasonable.

Were this court to have concluded that the conduct of the medical personnel at the Veteran's Administration Hospital in Shreveport constituted medical malpractice, however, the plaintiff has also failed to prove that observation or treatment would have increased his chance of survival. No evidence was produced which indicated that hospitalization for observation would have made it possible to identify the coming stroke, and the court remains convinced that the stroke that ultimately resulted in Mr. Maddox' death would have occurred whether he was at home or in the hospital. Nor has plaintiff proven that medical procedures available under these circumstances would have increased Mr. Maddox' chance of survival had he remained for observation.

The defendant shall prepare a judgment consistent with the terms of this Memorandum Ruling.

THUS DONE AND SIGNED.